*4C*

**FILED**

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUN 1 7 2008 *new*
6-17-2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA §
Plaintiff, §
v.        Respondent(s), §
§
§
Lawrence Potochney, Defendant, §
#21849-424        Petitioner, §
Movant. §

NO. 05 CR 194-11RWG
08 CV 1272 (habeas)

**JUDICIAL NOTICE**

Affirmed/Declared true & correct.

SUPPLEMENT TO MOTION FOR WAIVER OF FEES
AND COSTS, WITH LEAVE OF COURT ON
MOTION TO PROCEED AS AN INDIGENT
AND IN FORMA PAUPERIS FOR THE
FINANCIAL-ASSISTANCE OF COUNSEL,
DUE PROCESS-EQUAL PROTECTION OF THE LAW
AND REDRESS OF GRIEVANCES ON FIRST HABEAS CORPUS PETITION
TO THE MERITS, AS OF RIGHT(S) & PRIVILEGE(S)

On February 19, 2008 Movant-Defendant-Petitioner Mr. Potochney

mailed-filed (03/03/08) for his Privilege of habeas corpus-writ/

remedy per § 2255 - Motion with then "jailhouse counsel" since

sferred by the BOP, destination unknown.

Based on earlier filings for waiver of Fees and Costs

(02/12/08) "RECEIVED"), Mr. Potochney received a "DOCKET ENTRY

TEXT" (02/29/08) which "would ordinarily be granted" upon the

habeas filing. Mr. Potchney herein Supplements same as titled

above. At present his is without counsel, as "actually in-

nocent" of the indictment.

On 04/25/08 Mr. Potochney mailed a Petition for Writ of

Mandamus to the Court to compel former court appointed counsel

J. Clifford Green... Jr. to forward the file-record to his former

client, in the administration of law and justice. He assumes,

considering, the Court has received-filed same.

Movant Potochney herein seeks the financial-appointment/

assistance of counsel to effect his Bill of Rights & Privileges

*1-14*

pursuant to the "Great" Writ of Habeas Corpus, off his wrongful
conviction-sentence, as his first direct appeal as of Right, as
therefore necessary to restore his Process for direct appeal of
this conviction-sentence due at least to <u>inadequate</u> and ineffect-
ive assistance from court appointed counsel apparently unspecial-
ized in the practice of criminal law furthered out of the U.S.
Attorney's boiler-rooms at 53 W. Jackson Blvd.-Chicago 60604.

**Exhibit A.**

Petitioner also needs the assistance of specialized counsel
to apparently:    **Exhibit A1** (example).

1).  Ammendment-supplement to his original habeas filing.

2).  Motion for Bail pending direct appeal, by § 2255 motion.

3).  Motion for Recusal of partial-prejudicial Judge(s)
as may be necessary upon review of the record or remand.

4).  Prosecution of his direct appeal, with the assistance
of counsel as of right, via § 2255 habeas corpus motion, **Art. I, §9, Cl 2,**
**Art. IV, §2.**

5).  Adequate prosecution of his habeas Privilege considering
the pattern of criminal obstructions of Process-Redress by the
Department of Justice (double standard) from within their federal
prison "warehousing" inquisition.  **Exhibits B & B1.**

6).  Motion for specialized services of private investigators,
experts, witnesses, etc.

7).  Motion for Discovery and Hearing, as necessary.

MEMORANDUM OF LAW IN SUPPORT OF SPECIALIZED COUNSEL ON HABEAS CORPUS

Petitioner has constitutional rights to procedurally fair (due process) postconviction proceedings providing for the assistance of competent counsel and financial support services (i.e., witnesses, private investigators, records, legal resources, copies, etc.). **Title 18 USC § 3006A & Rule 44**, F.R. Crim. P., **1st, 5th & 6th** Amendment Rt(s), **Art. IV, § 2**, Privileges and Immunity(s),

Petitioner has constitutional Right(s) & Privilege(s) to the great writ of habeas corpus under Article 1, § 9, Clause 2, Art. IV, § 2 and the 14th Amendment (Equal Protection - Privileges). A right-privilege to redress grievances against the government, Art. IV, § 2 & First Amendment, as interwoven. Petitioner has a Fifth Amendment Due Process right to fair procedures, meaningful access to the law and courts, and protection from suspension of the writ of habeas corpus.

There frequently are claims for which postconviction necessarily serves as the prisoner's "one and only appeal" and, accordingly as to which postconviction procedures arguably ought to adhere to the constitutional norms of fairness and due process and apply on direct appeal. **Coleman v. Thompson**, 501 U.S. 722 (1991) left open the question whether there is a constitutional right to counsel in the not uncommon situation in which postconviction proceedings are, in essence, the prisoner's one and only appeal of an issue. Failure to consider Petitioner's claim presented herein will result in a fundamental miscarriage of justice with a probability of innocence. See Schlup v. Delo, 513 U.S. 298, 321-22 (1995).

The procedural due process component of the Due Process Clause, the meaningful access component of the Due Process Clause, the Suspension Clause and the Equal Protection Clause all provide strong bases for a constitutional right to counsel on substantial issues in postconviction proceedings,

A.    **Procedural Due Process:**   In **Ake v. Oklahoma**, 470 U.S. 68, 76 (1985), the Court held that "the Fourteenth Amendment's due process guarantee of fundamental fairness" requires the State to take steps to assure that criminal defendants have a fair opportunity to present their defense, including by providing them with funds for expert assistance, appearing to apply whenever an indigent litigant's interest in the outcome of a proceeding is <u>substantial</u>. **E.g.,** "actual innocence."

Each of the three **Ake** criteria arguably supports the provision of counsel and essential financial assistance to petitioners in state postconviction proceedings. <u>First</u>, the prisoner has a strong interest in having his constitutional claims fairly presented and adjudicated. "The private interest in the accuracy of a criminal proceeding that places an individual's life or liberty (or property) at risk" --- The central concern in state prostconviction proceedings --- is "almost uniquely compelling." **Id.** @77. To the extent that a prisoner can demonstrate that the effective assistance of counsel or some type of financial assistance is necessary to test the reliability and accuracy of the guilt and sentencing determinations at trial, his "private interest" is similar to the one at stake in **Ake**.  <u>Second</u>, of great importance, the governmental interest adversely affected by the appointment of counsel or the provision of essential financial assistance is, of course, monetary --- an interest generally held to be of secondary importance when compared to the constitutional rights enforced in postconviction proceedings. **Id.** @ 79 (state has no legitimate interest in using its superior financial position for "maintenance of a strategic advantage"); **Bounds v. Smith,** 430 U.S. 817, 825 (1977)("cost of protecting a constitutional right cannot justify its total denial"); **Smith v. Bennett,** 365 U.S. 708, 713 (1961) ("Financial hurdles must not be permitted to condition its [the writ of habeas corpus'] exercise.")

The fact that many States provide postconviction counsel and other essential financial assistance to prisoners belies any claim that providing such resources is preclusively expensive.  Federal prosecutors are fully aware of this expense going in and when deciding to pursue selective prosecutions against the poor, uneducated, culturally deficient foreigners or simple minded, naive political targets who have no other choice but to go along with whatever strategy their court appointed attorney's (officers) parlay, in lining their pockets. Especially when prosecutors further the expense by superceding the indictment in retaliation for the exercise of luxuries such as a jury trial, outside fundamental  constitutional protections contrary to the presumptions of innocence in subtle reversal of same from the confines  of Federal prisons where the Department of Just-us Process manipulates all the strings.  Third, the value of the procedural Process safegard and the added risk of erroneous deprivation of the affected interest absent the safeguard --- also supports the appointment of counsel and/or financial assistance for convicted persons (i.e., reliability, articulation, and reduced burden on judges; an overburden brought on by the "iron triangle" of "profiteers." Ex. C.

Finally, representation by counsel inevitable will make post-conviction review a more reliable device for correcting constitutional error; counsel that is professionally responsible and conflict-free. Were the sophisticated nature of the substantive law not sufficiently daunting, the petitioner is also faced with a perplexing array of procedural pitfalls, such as the exhaustion doctrine, procedural default, non-retroactivity, Gov't abuse of the writ. See McFarland v. Scott, 512 U.S. 849, 855-56; id. at 860 (O'Connor, J., concurring in the judgment

in part  (appointed lawyer must be available to help prepare petition).*

B.        **Meaningful Access to the Courts:**  The Court has also held that prisoners have a constitutional right to meaningful access to state postconviction courts, as interwoven with right to Redress.  See <u>Bounds</u>, <u>supra</u> @ 825 (due process right to "reasonably adequate opportunity to present claimed violations of fundamental rights to the courts").  **Acc-ord** <u>Lewis v. Casey</u>, 518 U.S. 343, 350 (1996).  The "right of access to the courts ... is founded in the Due Process Clause and assures that no person will be denied  the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." **Wolff v. McDonnell**, 418 U.S. 539, 579 (1974).  **See also** <u>Tennessee v. Lane</u>, 541 U.S. 509, 533 (2004) ("ordinary considerations of cost and convenience alone cannot justify a State's failure to provide individ-uals with a meaningful right of access to the courts").  Id. @ 532 & n21. **Smith v. Bounds**, 610 F.Supp. 597, 603 (E.D.N.C. 1985), **aff'd**, 813 F.2d 1299 (4th Cir. 1987, **aff'd en banc & supplemented**, 841 F.2d 77 (4th Cir.) **(per curiam)**, **cert. denied** 488 U.S. 869 (1988)("the best method to insure ... access would be to set up a prisoners legal services program or provide some other form of assistance of counsel")  **See also** <u>Lewis v. Casey</u>, <u>supra</u> @ 356 (prison officials must devise suitable mech-anism to "ensure that inmates with language problems have a reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement"; mere physical access to the law library is insufficient because "it is th[e] capability [of filing suit], rather than the capability of turning pages in a law lib-rary, that is the touchstone").  **McFarland, supra** @ 856, 858 ("right to

---

* The BOP/DOJ; this select institution goes out of its way to complicate prisoners legal process so as to provide their federal attorneys a necessary tactical advant-age in avoiding accountability for their "warehousing" agenda and selective/vindic-ive prosecutions so as to further their legal-law enforcement (economically driven) growth industry, including federal prison industries and local communities as earmarked.

[habeas corpus] counsel necessarily includes a right for that counsel meaningfully to research and present a defendant's habeas claims," else there is "substantial risk that [petitioner's] habeas claims never would be heard on the merits"); id. @ 868 (Thomas, J., dissenting)("legal assistance prior to the filing of a federal [habeas corpus] petition can be very valuable to a prisoner"). See Johnson v. Avery, 393 U.S. 483, 486, (1969)("for the indigent as well as for the affluent prisoner postconviction proceedings must be more than a formality"). In factually or legally complex postconviction cases and in cases in which the petitioner is mentally incompetent or for some other reason unable to grapple with the issues, fundamental fairness requires the provision of counsel and other necessary financial assistance. "It is unfair to require that a citizen, in order to assert a claim, (e.g., forfeiture) either to hire a lawyer experienced in the intricacies of specialized maritime/forfeiture law or risk suffering summary forfeiture of property." U.S. v. Three Parcels, 43 F.3d 388, 395 (8th Cir. 1994)(Beam, J. Circuit Judge, concurring specially). Under the aspect of due process, therefore, counsel and necessary financial assistance arguably are constitutionally required in those circumstances in which the petitioner or class of petitioner makes a particularized showing that the denial of counsel and necessary financial assistance is tantamount to the denial of meaningful access to postconviction remedies --- i.e , that, under the circumstances "[t]he right to be heard [will] be ... of no avail it it d[oes] not comprehend the right to be heard by counsel." Powell v. Alabama, 287 U.S. 45, 68-69 (1932).

C.        Suspension Clause:   "There is no higher duty than to maintain [the writ] unimpaired."  Johnson, supra @ 485 (quoting Bowen v. Johnston, 306 U.S. 19, 26 (1939).

A habeas corpus case set in the immigration context, **INS v. St. Cyr**, 533 U.S. 289 (2001) ruled that the statutes should not be read to foreclose federal habeas corpus review;  that such a construction would "present a serious Suspension Clause issue." **Id.** @305.  "It explained:

> A construction of the amendments at issue that would entirely preclude review of a true question of law by any court would give rise to substantial constitutional questions.  Because of the Suspension Clause, some "Judicial intervention in deportation cases" is unquestionably "required by Constitution." **Id.,** @ 300, 305

The unavailability of any "adequate substitute" for habeas corpus review was important to the Court's Suspension Clause analysis because, "Congress could, without raising any constitutional questions, provide an adequate substitute ...  The Suspension Clause must be read to create an affirmative protection of the continuing availability of habeas corpus review.  **See e.g.,** id @ 340 n.5 (Scalia, J., dissenting) ("The Court's position [is] that a permanent repeal of habeas jurisdiction is unthinkable (and hence a violation of the Suspension Clause)").

In **Hamdi v. Rumsfeld,** 124 S.Ct. 2633 (2004), Justice O'Connor began that "Hamdi was properly before an Article III court to challenge his detention under 28 USC § 2241" because the Suspension Clause established the availability of federal habeas corpus review absent suspension of the writ, and no such suspension has occurred:

> All [parties] agree that, absent suspension, the writ of habeas corpus remains available to every individual detained within the United States ... as a critical check on the Executive, ensuring that it does not detain individuals (or their property) except in accordance with law.  **Id.** @2644.

In **Rasul v. Bush,** 124 S. Ct 2686 (2004), Justice Stevens explained an earlier decision of the Court as resting not on the **"statutory entitlement to habeas review"** but rather the **"constitutional** entitle-

ment to habeas corpus." Id. @2693-94.  "subsequent decisions of th[e] Court" have established that the prisoner's  presence within the territorial jusisdiction of the district court is not 'an invariable prerequisite' to the exercise of district court jurisdiction under the federal habeas statute," so that "persons detained outside the territorial jurisdiction of any federal district court no longer need rely on the Constitution as the source of their right to federal habeas review." Id. @2695.

Therefore, the Court's analysis and ultimate ruling in St. Cyr, Calcano-Martinez, 533 U.S. 348 (2001), and a third immigration-related habeas corpus decision issued three days later, Zadvydas v. Davis, 533 U.S. 678 (2001), all stand as testimonials to the Court majority's conception of the writ (and its guarantor, the Suspension Clause) as requiring courts to look beyond the limited question of the custodial entity's facially apparent legal authority (whether by means of statute, court adjudication, or other form of authorization) and to scrutinize the underlying adjudication or determination to ensure that it actually is lawful. St. Cyr, supra @ 301 ("at the absolute minimum, the Suspension Clause protects the writ, as it existed in 1789."). "Meaningful assistance of counsel is essential to secure such federal constitutional rights." McFarland v. Scott, 512 U.S. 849, 859, (1994); Battle v. Armontrout, 902 F.2d 701, 702 (8th Cir. 1990) ("appointment of counsel would benefit ... the court by allowing counsel to develop arguments focus the court's analysis"); Shields v. Jackson, 570 F.2d 284, 286 (8th Cir. 1978); Taylor v. Pegelow, 335 F.2d 147 (4th Cir. 1964) ("innumerable difficult questions and inordinate waste of time of judges and lawyers ... might ... have been avoided

if the District Court had appointed counsel."); adequate counsel.

In conformity with these expressions of congressional intent, by statute (e.g., 18 USC § 3006A(g), predecessor to 3006A(a)(2)(B)), the courts generally have endorsed the appointment of counsel to represent indigent and legally unsophisticated prisoners in:

(1) Cases that turn on substantial and complex procedural, legal or mixed legal and factual questions (e.g., ineffective assistance of counsel, forfeiture, double jeopardy, voluntariness of waivers). See e.g., Reese v. Fulcomer, 946 F.2d 247, 264 (3rd Cir. 1991)(citing cases)("[f]actors influencing a court's decision to [appointment of counsel in habeas corpus cases] include the complexity of the factual and legal issues in the case.

(2) Cases involving uneducated or mentally or physically impaired petitioners. See e.g., Merritt v. Faulkner, 697 F.2d 761, 764 (7th Cir. 1983)(section 1915)(counsel required for particular claim because of "novelty and complexity").

(3) Cases in which "the indigent is in no position to investigate crucial facts." Maclin v. Freake, 650 F2d 885, 887 (7th Cir. 1981); Accord, e.g., Abdullah v. Norris, 18 F.3d 571, 573 (8th Cir. 1994) (factors to consider in determining whether to appoint counsel include "petitioner's ability to investigate and present his claim").

(4) Factually complex cases, e.g., ones involving "conflicting testimony," in which the truth is more likely to "be exposed where both sides are represented by those trained in the presentation of evidence." Maclin, supra @ 888; Manning v. Lockhart, 623 F.2d 536, 540 (8th Cir. 1980)("question of credibility of witnesses and (other) ... case presents serious allegations of fact" (and prior proceedings).

Some courts apply even more liberal appointment of counsel rules, assigning attorneys in:

(5) Cases in which the petitioner "has a colorable claim but lacks the capacity to present it" or in which the legal issues are difficult and the petitioner has not demonstrated a workable knowledge of the legal process." See Hughes v. Joliet Correctional Center, 931 F.2d 425, 429 (7th Cir. 1991)(section 1915)("Hughes has a colorable case, but without the assistance of a lawyer was likely to be tripped up (again) by his opponents' (unlimited government resources) lawyers"); Maclin, Supra @ 889.

(6) Cases involving at least one strong legal claim. Hahn v. McLey, 737 F.2d 771, 774 (8th Cir. 1984)(§ 1915(e)(1)(2000)) (when an indigent presents a colorable civil claim to a court, the court, upon request, whould order the appointment of counsel from the bar."), citing Nelson v. Redfield, 728 F2d 1003 (8th Cir. 1984).

(7) Analogous cases. See e.g., Hodge v. Police Officers, 802 F.2d 58, 62 (2nd Cir. 1986)("any apecial reason ... why appointment of

counsel would be more likely to lead to a just determination"); Schultz v. Wainwright, 710 F.2d 900, 901 (11th Cir. 1983)("when the interests of justice or due process so require"); Hitchcock v. Eyman, 418 F.2d 1245, 1246 (9th Cir. 1969)(severity of sentence);

Courts make no distinction between capital and noncapital cases when addressing an indigent defendant's right to appoint counsel in post-conviction proceedings. Murray v. Giarratano, 492 U.S. 1, 10 (1989).

Denial of counsel is presumed prejudicial for purpose of claim of ineffective assistance of trial counsel. Defendant is entitled to different counsel to pursue claim of ineffective assistance. Reagan v. Norris, 279 F3d 651, 658 (8th Cir. 2002)("the ineffectiveness of his post-trial and appellate counsel establishes the cause necessary to excuse petitioner's failure(s)..."). An indigent prisoner applying to a federal court for habeas corpus is not entitled to an appointed attorney unless the particular circumstances indicate that it is necessary to obtain due process. Kreiling v. Field, 431 F.2d 638, 640 (9th Cir. 1970); Gomez v. Vernon, 255 F.3d 1118, 1122 (9th Cir. 2001)(inmates of prison that "employs prison inmates as law clerks in its prison libraries to help other inmates file legal papers, such as habeas corpus petitions ... enjoy access to the law libraries, and the assistance of the inmate law clerks, as a guarantee of their due process right of access to the courts" (citing Bounds v. Smith, supra)); Cornett v. Donovan, 51 F.3d 984 (9th Cir. 1995)(constitutional right of access to court requires provision of attorneys or legal assistants to assist mentally ill patients involuntarily committed to state hospital in filing habeas corpus petitions as well as replies to opposing parties' responsive pleadings.* Exhibit C1.

_____

* Specifically, FCI-Waseca, is indifferent (political agenda) to hiring law clerks. It only hires orderlies to "hand out specific books requested by inmates," most who would not know one book from the next. Inmates not assigned, are not allowed inside the law library as a subtle ploy to obstruct access. Donated materials are trashed by staff who are without a clue as to their usefulness, e.g., Prison Legal News (www.prisonlegalnews.com) and law dictionaries.

"Our cases establish that the right to appointed counsel ex-
tends to the first appeal of right... ." **Pennsylvania v. Finley,**
481 U.S. 551, 555, <u>et</u> <u>al</u> (1987).  In general, various habeas corpus
doctrines provide greater review in situations in which the petition-
er can make a colorable showing of innocence, a particularly high
likelihood of prejudice, or otherwise can demonstrate that denial of
relief would result in a miscarriage of justice.  "The oldest purpose
of the Great Writ is as 'a swift and imperative remedy in all cases of
illegal restraint or confinement!" **Fay v. Noia,** 372 U.S. 391, 400, <u>et</u>
<u>al</u> (1963)("in form the Great Writ is simply a mode of procedure... .").
**Id.** @ 401.  It is not therefore legally conclusive by the Supreme Court
that the right to counsel does not exist in postconviction proceedings
under  all potentially applicable provisions of the United States Con-
stitution or pursuant to his unalienable Right(s) in the Declaration
of Independence.  This considering that it appears .... the federal
government vested interests $$$ in "warehousing" citizens intention-
ally engineered the conviction and imprisonment, also rendering their
court appointed - assistance of counsel - inadequate and ineffective,
to circumvent any meaningful prosecution of post-conviction and con-
stitutionally mandated habeas corpus prosecutions from the confines
of federal prison under presumptions obtained and essentially being
maintained by fraud via "procedural morass" (expensive), See Ex. D6,
conveniently without specialized, professional and competent counsel.

Not only the procedural due process Clause, but also the "mean-
ingful access" component of Due Process, the Suspension Clause, and
the Equal Protection Clause, provide strong bases for concluding
that counsel is required in at least some post-conviction proceedings,
and at least by habeas corpus Privilege (**Art. IV, §2**) also to Redress,
Due Process and Equal Protections of the Law.

## CONCLUSION

It appears to a reasonable, impartial, conflict-free person that the Court appointed attorney, an officer of the Court, was also an officer for the DOJ, in the least, in failing to defend Mr. Potochney under various presumptions of guilt so as to reverse the burden of proof from the confines of the DOJ's federal prison solely because he was a drug addict.

Petitioner-Movant was provided his **per se** Sixth Amendment assistance of counsel for trial and it appears this court appointed assistance of counsel was wholly inadequate and unprofessional (code) in his representation.

Mr. Potochney, in the presence of Melody Zaha, told his attorney, emphatically, that he wanted to appeal at the time of the engineered guilty plea to a crime he was not guilty of, and at sentencing, but his attorney's agenda rendered him unwilling to take the time to file such NOTICE. This, knowing full well that Mr. Potochney would be unable to defend himself from federal prison in having conveniently switched the burden of proof, with the presumption of guilt, without then the assistance of counsel or meaningful and adequate Process-Redress as circumvented by the DOJ for their necessary tactical advantage on post-conviction prosecution. This declaration to appeal was after his own attorney maneuvered his client into a guilty plea, first threatening a 5-year, then a ten-year and finally a 15-year sentence if he did not plead guilty "right now." **Exhibits D, D1, D2, D3, D4, D5 & D6.**

It appears that the Judge, knowing full well the tactics, went along with the charade of Justice as Mr. Potochney was left defenseless against fleets of U.S. Attorney's and unlimited taxpayer resources. **Exhibits E1 & E2.** Federal courts and expense are not necessary

to imprison American's using this brand of "so-called justice." **See Ex. B1.**
All that is necessary ... for the DOJ to drive around the streets
and pick warm, moving bodies, much like a dog catcher, as they al-
ready assume all American's commit some crime(s) within their life
span. **Exhibit E3.** This "brand" of Justice is soon to be voted out
of office. **Exhibits F1 & F2.**

 **THEREFORE**, considering the charade of so-called justice, the
**DOJ** shall be ORDERED to foot the bill for post-conviction assistance
(financial) of counsel to retain same or by newly assigned Judi-cial app-
ointment, in the interests of law and justice (28 USC § 2243(8)) this
time around, in the publics (taxpayer) interest. Also pursuant to
Title 18 USC § 4042(a)(2), § 4007, Rule 44 and Title 5 USC § 555(b) +
ORDERED to pay court costs, just as a citizen target would be requir-
ed for abusing the courts Process and integrity, etc. **See** Citizens
Protection Act, Title 28 USC § 530B, § 1657 ("the court shall exped-
ite the consideration of any action brought under chapter 153"(habeas
corpus)), Rule 1("These rules .... shall be construed and administer-
ed to secure the just, speedy, and inexpensive determination of every
action."), Title 18, Rule 2 ("These rules are to be interpreted to pro-
vide for the just determination of every criminal proceeding, to sec-
ure simplicity in procedure and fairness in administration, and to el-
iminate unjustifiable expense and delay."), 28 USC § 2072 & Title 5
USC § 901.

Dated:  June   , 2008

Certification of Mailing:

Submitted in good faith, affirmed true and
correct (28 USC § 1746WoP) with all Right(s)
reserved as without counsel .

Lawrence Potochney, #21849-424
POB 1731-D, FCI-Waseca
1000 University Drive SW
Waseca, Minnesota 56093-0741
(507) 835-8972, 837-4547Fax

14-14

of the police-budget committee. "And if fighting gang violence in this city is our highest priority, it should be reflected in our budget" even though, Yaroslavsky acknowledged, "it will be at the expense of virtually anything else." Added council member Richard Alatorre, "This is the era of the police. If I were chief, I'd ask for more."

Night after night, Hammer teams roared through the neighborhoods of South Central. Any black kid seen out after dark was subject to a frisk and interrogation. "I think people believe that the only strategy we have is to put a lot of police officers on the street and harass people and make arrests for inconsequential kinds of things," Chief Gates said. "Well, that's part of the strategy, no question about it." The head of the LAPD's Hardcore Drug Squad compared South Central to Vietnam, an aptly bellicose metaphor.

In August, eighty-eight officers stormed a South Central apartment block suspected of being a gang headquarters. "This is a Class-A search," the captain in charge told his men. "That means carpets up, drywall down. Level it. Make it uninhabitable." The policemen followed orders, smashing furniture and walls with sledgehammers, ripping an outside stairway away from the building, and spray-painting "LAPD Rules" on the walls. At the stationhouse, thirty-two people captured in the raid were forced to whistle the theme song from the *Andy Griffith Show* (which LA historian Mike Davis calls "the Horst Wessel song of the LAPD") while being beaten with fists and flashlights. In the end, only two arrests were made: a couple of visiting teenagers had some dope in their pockets. No gang members, guns, or crack caches were found.

Nobody was killed in that particular raid. But by the end of 1988 LAPD officers had shot dead two unarmed citizens of South Central — a teenager suspected of being a gang member and an eighty-one-year-old retired construction worker. No disciplinary action was taken. "When you have a state of war, civil rights are suspended for the duration of the conflict," the press secretary for one state senator told reporters.

Hammer didn't rid South Central of crack and gang violence, even at the cost of civil liberties and civilian casualties. Although the LAPD had arrested, at one time or another, three-quarters of all the young black men in Los Angeles, juvenile crime was climbing 12 percent annually by the end of the decade. Crack was cheaper than ever, the gangs stronger, more violent, and better organized than before Hammer.

"Gangs are never goin' to die out," a sixteen-year-old gang mem-

by DAN BAUM    ISBN 0-316-08412-3
(1996) Little, Brown + Co.

ber told the *Los Angeles Times* when Hammer started. "You goin' to get us jobs?"

"The concept of user accountability is a fundamental theme throughout the drug strategy," Meese's 1988 National Drug Strategy report declared. "Individuals can, with proper treatment and incentive, stop using illegal drugs." The Strategy, though, was short on treatment and long on incentive. Of its twenty-four pages, ten were devoted to enforcement, interdiction, foreign operations, and "intelligence"; one was devoted to treatment. And of the four treatment objectives the only one to mention funding was number three: "Stimulate private sector involvement."

"We must do away with these previous talks of fairness and niceness," drug czar Ian MacDonald told the *Baltimore Sun*. "We've got to talk about sanctions."

Even in 1988 it was clear that blacks were being disproportionately targeted for drug arrest, and Meese — who hired the public relations firm Hill & Knowlton to polish the Drug War's image — was sensitive to charges that the War on Drugs was turning into a war on blacks. In March, he sent a memo to all of his U.S. attorneys encouraging selective prosecution of "middle and upper class users" in order to "send the message that there is no such thing as 'recreational' drug use." Nancy Reagan, too, swung her rhetorical guns temporarily at upper-class cokeheads. "The casual user may think when he takes a line of cocaine or smokes a joint in the privacy of his nice condo, listening to his expensive stereo, that he's somehow not bothering anyone," she said to a White House drug conference that year.

But there is a trail of death and destruction that leads directly to his door. The casual user cannot morally escape responsibility for the uaction of drug traffickers and dealings. I'm saying that if you're a casual drug user you're an accomplice to murder. "Capital Crime(s)²"

Here was an argument with some potential. Anti-fur, anti-oil, anti–South Africa, anti-military, and a whole range of other activists had been making similar arguments for their causes for years. Cocaine is indeed a foul business, liberally stained with blood and corruption.

1988



For **39** years, The Law Offices of Alan Ellis has worked with federal defendants and inmates, and consulted with many of the nation's leading criminal defense attorneys, to develop strategies that obtain the lowest possible sentence for clients, to be served at the best facility possible, with the greatest opportunity for early release.

Areas of concentration include:

- Plea negotiations
- Sentencing representation and consultation
- Prison designation, transfers and disciplinary matters
- Rule 35 motions
- Direct appeals in all circuits of convictions and sentences.
- Supreme Court practice
- Habeas corpus 2255 and 2241 petitions
- International prisoner transfer treaty work for foreign inmates and Americans incarcerated abroad
- Parole representation
- International human rights.

The firm has a international practice with regional offices in Mill Valley (San Francisco), CA, and Ardmore (Philadelphia), PA. It will soon be opening its first foreign offices in Hong Kong and Shanghai.

## 2008 HOURLY BILLING RATES

| | |
|---|---|
| Alan Ellis, Esquire (AE) | $500.00 |
| Peter Goldberger, Esquire (PG) | $450.00 |
| Karen L. Landau, Esquire (KL) | $400.00 |
| James H. Feldman, Jr., Esquire (JHF) | $400.00 |
| Pamela A. Wilk, Esquire (PW) | $400.00 |
| J. Michael Henderson, prison specialist (MH) | $275.00 |
| Philip S. Wise, prison specialist (PSW) | $275.00 |
| Lianne C. Scherr, L.C.S.W. (LS) | $275.00 |
| Tess Lopez (TL) | $275.00 |
| Saundra Muncy, executive assistant (SM) | $200.00 |
| Deborah Bezilla, administrative assistant (DB) | $150.00 |
| Chris Lege (CL) | $100.00 |

**FEDERAL SENTENCING AND POST-CONVICTION NEWS**

*Published Quarterly*

Alan Ellis, PUBLISHER
James H. Feldman, Jr., EDITOR

**CALIFORNIA**
495 Miller Ave.
Mill Valley, CA 94941
Phone: (415) 380-2550
Fax: (415) 380-2555
AELaw1@alanellis.com

**PENNSYLVANIA**
50 Rittenhouse Place
Ardmore, PA 19003
Phone: (610) 658-2255
Fax: (610) 649-8362
AELaw2@alanellis.com

Telephone calls are billed at a minimum of .2 hours; letters are billed at a minimum of .3 hours; receiving and sending emails are billed at a minimum of .2 hours.

Alan Ellis, James Feldman, Karen Landau, Lianne Scherr, and Tess Lopez's out-of-the-office trips are billed at a minimum rate of $5,000, $4,500, $4,000, $2,750, and $2,500 respectively for each day spent outside of the office. Any time spent working on other cases while traveling is deducted from the above amount.

New cases requiring immediate attention (action within five business days of retention) may be charged a 50% hourly surcharge for any work done during the first five days of representation.

**www.alanellis.com**

**SAN FRANCISCO** | 495 MILLER AVENUE, SUITE 201, MILL VALLEY, CA 94941 • P 415.380.2550 • F 415.380.2555 • AELaw1@alanellis.com
**PHILADELPHIA** | 50 RITTENHOUSE PLACE, ARDMORE, PA 19003 • P 610.658.2255 • F 610.649.8362 • AELaw2@alanellis.com

FR

A1

# Curing the Rot at Justice

With top lawyers and administrators resigning at an alarming rate, the scandal-plagued Justice Department is becoming an increasingly dysfunctional agency, a shell without credible leadership. Within that shell lies the rot of politicization, as evidence mounts that the Bush Administration has used the nation's chief law enforcement agency to undermine not just civil liberties but democracy itself, and so it shall be as long as the primary architect of the department's decline, Attorney General Alberto Gonzales, remains at the helm. Yet while he is as discredited as any sitting Attorney General since the 1920s Teapot Dome scandal, Gonzales clings to the power afforded him by the President and by a standoff between a White House that will not admit its sins and a Congress that is only now beginning to address the crisis with the aggressiveness it demands.

Make no mistake, the crisis is real. Things have gotten so bad that, when asked whether he'd return to the department where he served as a senior official under John Ashcroft, Viet Dinh said, "I'd rather trade places with [accused "enemy combatant"] José Padilla." Each day brings new revelations of abuses: using the authority of the department to achieve partisan goals, neglecting basic responsibilities to protect civil rights and civil liberties, blocking promotions of top lawyers because Vice President Cheney thought them more loyal to the Constitution than to the Bush agenda. Still Gonzales lingers, while capable lawyers leave—an exodus highlighted by the recent departure of Deputy Attorney General Paul McNulty. Senate Judiciary Committee member Chuck Schumer, who got a majority of senators to endorse an attempt to schedule an anti-Gonzales no-confidence vote on June 11, refers to McNulty as a conservative with a conscience "who at least tried to level with the committee." His departure is a blow to the morale of career lawyers mired in a department increasingly defined by ideological extremism, incompetence and the paranoia of Gonzales. House Judiciary Committee chair John Conyers Jr. says, "McNulty's resignation is a sign that top-level administration at the Justice Department may be crumbling under the pressure of ongoing revelations and what is yet to be disclosed."

The gross affronts to the rule of law committed under Gonzales go far beyond the firings of US Attorneys considered insufficiently aggressive in their pursuit of bogus "voter fraud" claims, or even the evidence that prosecutors may have kept their jobs by going after Democratic voters and officials. The Brennan Center for Justice and the Lawyers' Committee for Civil Rights Under Law have uncovered evidence of what they describe as "a much broader strategy on the part of the Administration to use federal agencies charged with protecting voting rights to promote voter suppression and influence election rules so as to gain partisan advantage in battleground states." There is now a compelling case that the White House used the Justice Department's Civil Rights and Criminal divisions and the Election Assistance Commission to create a false perception of widespread voter fraud to justify initiatives—stringent voter identification laws, crackdowns on voter registration drives and pre-election purges of eligible voters from the rolls—designed to disenfranchise the poor, minorities, students and seniors. But even as the evidence mounts, Bush continues to demand Senate approval of his nomination of a proponent of Justice's voter suppression strategy, Hans von Spakovsky, to sit on the Federal Election Commission.

The voter suppression drive is just one example of the White House's crude warping of the Justice Department's mission. Its dark plotting includes a warrantless wiretapping scheme that, we now know, even Ashcroft found objectionable—and that a growing number of Congressional Republicans see as confirmation of the need for a new Attorney General. But Bush and Gonzales are operating on the theory that if they pretend to be the victims of partisan bickering on the Hill, they'll be able to wait out the storm.

Jerrold Nadler, who chairs the Constitution subcommittee of the House Judiciary Committee, frets about the lack of urgency regarding the "overwhelming obviousness of the fact that this entire warrantless wiretapping is illegal and the President and Attorney General are engaged in a criminal conspiracy." Frustrated by Justice's refusal to turn over internal legal opinions and other documents on the domestic surveillance program, Nadler is talking about subpoenas, while Conyers says, "It's about time process kicks in somewhere around here." The restlessness of Nadler, Conyers and Senate Judiciary chair Patrick Leahy is understandable. They are responsible legislators who have tried to work with Gonzales and the White House only to be constantly stonewalled. Clearly, the Congressional response must be adjusted.

One answer to the question of how to take the inquiry to the next level has come from the grassroots, in the form of a campaign by filmmaker Robert Greenwald and the activist group Democracy for America, demanding the impeachment of Gonzales. Other strategies are likely to come first, including the more aggressive use of subpoenas, like those issued June 13 to former White House counsel Harriet Miers and former political director Sara Taylor regarding their roles in the US Attorney firings. Leahy and Conyers will exhaust those tools before taking up impeachment. But no matter what steps are taken, the point has been reached where polite words must be replaced by bold demands. Allowing Gonzales to remain as Attorney General will only further undermine the government's commitment to defend the right to vote and the right of Americans to be safe from illicit government spying—not to mention the prospect that the rule of law might eventually be reasserted at a department that still has "justice" in its name.                    JOHN NICHOLS

# Our Justice System, So-Called

### By Donald P. Lay

In an effort to fight crime, we aimlessly set goals of putting more and more people into jails and prisons, regardless of consequential costs or the complete denigration of dignity and resulting human sacrifice. As a nation, we countenance, without apparent concern, increasing episodes of temporary banishment of individuals to horrific and indecent environs in our jails and prisons, and falsely assume on their return to society that they will become useful citizens bearing no resentment.

The criminal justice system is a disgrace to a civilized nation that prides itself on decency and the belief in the intrinsic worth of every individual. The system is a complete failure. The financial waste incurred by communities, cities, states and the Government is unbelievable. The crimes committed against those who are victimized by the system are intolerable.

The human waste caused by the warehousing of prisoners is unconscionable. The reverberation to our society is found in an increasing crime rate, resulting from the failure of the criminal justice system to adequately rehabilitate rather than show contempt for prisoners.

Charles B. DeWitt, President Bush's nominee to head the National Institute of Justice, has observed that the nation's prison and jail population recently passed the one million mark and is rising at a 13 percent annual rate. Maintaining that rate of growth would cost at least $100 million per week for construction of new facilities alone. There were 343,569 total inmates in the jail population in 1984. Local jail occupancy rate in 1989 was 108 percent of capacity; in 1988, it was 101 percent; in 1983, it was 85 percent.

Donald P. Lay is chief judge of the Eighth Circuit Court of Appeals. This article is adapted from an address to the National Association of Pretrial Service Agencies, in Minneapolis.

According to the Jail Population Statistics, Bureau of Justice Statistics Survey, dated June 30, 1989, 26 percent of jails were under Federal or state court order or consent decree to limit the number of inmates. Fifty-one percent of jails sampled held prisoners because of overcrowding in other institutions. This figure was 29 percent in 1983 and 17 percent in 1983. In 1989, 395,553 persons were held in state and Federal jails. This is a 15 percent increase over 1988.

According to Bureau of Justice statistics, in 1978 there were a total of 3,693 jails in operation, but by 1988 that number had decreased to 3,316, a 5 percent reduction. From 1983 to 1988, there was a 51 percent increase in the total jail population.

The atrocities that take place within jails and prisons are common-

## It is too costly and breeds crime, e.g. terrorism

place. A few years ago, I visited a correctional institution in a southern state. A 19-year-old farm boy had just been sentenced for one year for possession of marijuana. He was received in their central processing unit, designed to hold 120 prisoners. At that time there were 465 prisoners incarcerated in small cells in a four-level building that afforded little ventilation and no recreational area.

The young man was sent to a psychological evaluation unit. After two hours they picked up his exam papers and he had written only two words: "Help Me, Help Me." Officials discovered that he had been put in a small cell block containing four beds with 11

other inmates who had sexually assaulted him for 48 hours, every hour on the hour.

A 19-year-old prisoner at the Missouri Training Center, the victim of a number of homosexual rapes, was given three alternatives by a prison official: submit, fight back or escape. He chose the last alternative. The Missouri Supreme Court affirmed his conviction for the escape charge, concluding that conditions of confinement do not justify escape and are not a defense.

The public has every right to deeply resent those who commit crime. However, the kneejerk reactions by angry executives, politically conscious legislatures and vindictive judicial officers is taking us down a primrose path with little success in combating crime.

The resulting approach is accomplishing nothing more than exorbitantly wasting tax dollars, creating a warehouse of human degradation and in the long run breeding societal resentment that causes more crime.

In the Federal system, the commitment to double the size of our prisons by 1995, to increase mandatory minimum sentences and to sentence by the crime and not by the individual is simply a corollary to this societal attitude.

There exists a crying need to develop a nationwide system of intermediate sanctions for those who are convicted of nonviolent felonies. Our penology system needs to develop work release programs, community service programs, schooling, vocational training and other forms of supervised productivity in lieu of wasteful expenditures of tax dollars and warehousing of individuals.

Punishment is one thing, but our incarceration policies are wasteful and should be changed. Present policies breed further crime, dehumanize individuals and require gross expenditures of tax dollars needed for other purposes. With our nation facing both societal and fiscal crises of unrivaled proportions, we must move quickly and forcefully to overhaul the current system.

THE NEW YORK TIMES — MONDAY OCTOBER 22, 1990

*Court TV* host Catherine Crier

look at a **damaged** legal sy

How the Lawyers, Politicians,
and Bureaucrats Have Turned
the Law into an Instrument of
TYRANNY—and What We as Cit-
izens Have to Do About It.

Broadway Books
Div. Bantam/Doubleday/Del
1540 Broadway
New York NY 10036 (800
?????-????-1225-683

*C*ourt TV host and lawyer Catherine Crier has
written an illuminating, frustrating, and
revealing look at our litigious society. No one is
safe from her penetrating study of a damaged legal system
that produces results and profits for the few and injustice for
the many. Both an angry indictment and an eloquent plea
for common sense, Crier exposes a system of flawed laws so
complex that even the enforcers can't understand them. She
also blasts the sue-happy system of liability that forces a
baby-stroller manufacturer to warn, "Remove child before
folding." Exposing the insidious relationship between gov-
ernment, lobbyists, and bureaucrats who profit from ineffi-
ciency, Crier's book will make you hopping mad at the sys-
tem. Just don't sue us for telling you about it. *256 pages.*

Save
30
CATHERINE
CRIER

THE CASE AGAINST LAWYERS

*The Case Against Lawyers*    ISBN
by Catherine Crier    0-7679-0504-0

**new** 85-4174 *pub. price $23.95*    [2002]

club price $16.75    FREE with 18 Bonus Points (Earns 3)

... million after
... ring shoes came
untied and she tripped

• in *Atlanta, a woman sued
her dance partner when his
clumsiness broke her
thumb—it cost him
$220,000*

As a child, Catherine Crier was enchanted by film portrayals of crusading lawyers like
Clarence Darrow and Atticus Finch;. As a district attorney, private lawyer, and judge her-
self, she saw firsthand how the United States justice system worked—and didn't. One of
the most respected legal journalists and commentators today, she now confronts a profoundly
unfair legal system that produces results and profits for the few—and paralysis, frustrat-
ion, and injustice for the many. Alexis de Tocqueville's dire prediction in <u>Democracy in
America</u> has come true: We Americans have ceded the resolution of society's problems—our
fundamental responsibility as citizens—to "legal authorities," and in doing so have given
up precious democratic freedoms.

The <u>Case Against Lawyers</u> is both an angry INDICTMENT and an eloquent plea for a return
to common sense. It decries a system of laws so complex thateven their enforcers—such as
the IRS—cannot understand them. It unmasks a litigation-crazed society where billion-
dollar judgments serve mostly to line the pockets of personal injury lawyers. It deplores
the stupidity of a liability system that leads to such results as a label on a stroller
that warns:REMOVE CHILD BEFORE FOLDING. It INDICTS a criminal justice system that puts
minor drug offenders away for life, yet allows celebrity murders to walk free. And it ex-
coriates the sheer corruption of the IRON TRIANGLE OF LAWYERS, BUREAUCRATS, AND POLITICANS,
who profit nightily from all this INEFFICIENCY, INJUSTICE, AND ABUSE.

The <u>Case Against Lawyers</u> will make readers hopping mad. And it will make them realize
that the only response can be to demand change now. The book addresses the immense injust-
ices of the current American legal system. It deplores the lack of common sense amongst
lawyers and bureaucrats and condemns the litigation-hungry attitude that pervades the
courtrooms today.

*C*



GUTKNECHT
District, Minnesota

COMMITTEE ON
GOVERNMENT REFORM
AND OVERSIGHT

COMMITTEE ON SCIENCE



RECEIVED
FCI WASECA

Dec 27  11 32 AM '96

# Congress of the United States
## House of Representatives    WARDEN'S OFFICE
### Washington, DC 20515–2301

December 24, 1996

Mr. Jim Tippy
Warden
Waseca Federal Mental Prison ✔
Waseca, Minnesota 56093

Dear Mr. Tippy:

Enclosed is a copy of a correspondence I have received from my constituent, ▓▓▓▓▓
▓▓▓▓▓   ▓▓▓▓▓▓▓▓▓▓ inmates at your facility, concerning various problems
they see. I believe you will find the letter self-explanatory.

I would appreciate it if you would review the enclosed letter and provide me with any
information that may be helpful to my constituent. Please direct your response to my office
at 1530 Greenview Dr. SW Suite 108, Rochester, MN  55902.

I am grateful for any assistance you may be able to provide in this matter.

Sincerely,

Gil Gutknecht
U.S. Representative

GWG:eky
enclosures

C1

HOME OFFICE.

FINANCIAL TIMES 5

5/6/08 F.T.

# World News

## Report warns of threats to freedom in US

### 'Grave concern' over renditions

**By Daniel Dombey in Washington**

The US "war on terror" has restricted the freedom of individual Americans – but to a lesser degree than in previous conflicts, a study said yesterday.

Freedom House, a US group best known for its work overseas, expresses "grave concern" at measures such as extraordinary rendition, "mistreatment of those in US custody" and warrantless wiretaps.

But it says: "The war on terrorism has resulted in significantly fewer violations of individual freedom than previous conflicts."

The other incidents it cites include the mass detention of Japanese-Americans dur-

internationally, and measures that could directly affect US citizens.

"While there is as yet little evidence to suggest that counter-terrorism programmes have severely impinged on the rights of substantial numbers of Americans, the potential for more widespread violations must be taken seriously," it says. "The prospects are good for further action by the courts and Congress to curtail or terminate initiatives that pose threats to individual rights."

The report calls its findings on the functioning of the US criminal justice system "perhaps the most disquieting in this study".

It highlights the rise in incarceration rates from 1.39 per thousand in 1980 to 7.5 in 2005, the high proportion of black inmates and complaints that public defence



Former U.S. Atty. Dan K. Webb in his office at Winstor & Strawn: "What person in America can afford to fight the government?"

P

## ARE WE WINNING? ~ 305

Atlanta — increased 1,000 percent from 1986 to 1990. Then, Bennett's Drug War budget sent almost $18 million to Georgia's police and prosecutors to help catch and convict more drug offenders, but gave not a penny to the state's public defenders. As a result, the public defender in DeKalb County had about ten minutes to spare for each client before pleading him through to sentencing. "That's not justice," he said. In the city of Atlanta, one public defender refused to take any more drug cases. She had handled 600 in ten months, she told a judge, about four times the number the ABA considered appropriate.

The situation was similar elsewhere. Anywhere from 70 to 90 percent of drug defendants nationwide were indigent. State legislatures and county commissions were reluctant to pony up money to help what was widely seen as "the enemy" in the Drug War and tended to agree with one Georgia lawman who said his profession viewed "indigent defense as a proxy for evil."

"Don't be silly, Jack," said Laurie Robinson, cradling the phone between ear and shoulder. "We'll go ahead without you."

Robinson, chief of the criminal division of the American Bar Association, had worked hard to arrange a meeting of the American Bar Association officials with Deputy Attorney General William Barr and didn't want to have to reschedule. Matters were too far out of hand. First, the attorney general had written his famous memo instructing prosecutors to ignore ABA ethics rules to jail drug dealers. Then, after months of frosty memos and snide innuendoes, Thornburgh threw a verbal grenade at the ABA. Speaking to the group's annual meeting in August, Thornburgh accused defense lawyers of "hindering the War on Drugs" by vigorously defending drug offenders. Robinson objected immediately, writing to request a meeting with Thornburgh. Thornburgh assigned the task of receiving the ABA to Barr.

Jack Curtain, a Boston lawyer serving as president of the ABA, was rushed to surgery for lung cancer just ten days before the scheduled October 9 meeting. "You're not going ahead without you," he told Robinson from his hospital bed. "Keep the appointment." Gaunt and pale, he hobbled into Barr's office leaning on Robinson's arm the day of the scheduled meeting.

Seated behind his desk, Barr didn't rise to greet them. He held his round, boyish face downward, studying a single piece of paper on his vast desktop. The ABA lawyers stood while a group of Barr aides filed

*[handwritten annotation:]* THORNBURGH MEMORANDUM

*[handwritten annotation:]* See Lopez, 765 F.Supp. 1433; 987 F.2d 1032; 4 F.3d 1455.

## 304 ~ SMOKE AND MIRRORS

worsened, as before. So did the terrifying spread of AIDS among drug users.

But from the moment Saddam's tanks crossed the border, what had been the nation's "number one problem" vaporized. Press coverage of the drug issue and the Drug War fell off a cliff. In 1989, 244 stories about the country's drug problems appeared in mainstream magazines. In 1990, 219 were written. In 1991, 138, and in 1992, 111.

Having been told by Bennett to "get out there on the stump," Reggie Walton found himself criticized within the drug office for traveling too much. It made Walton furious: those supercilious know-nothings surrounding Bennett harped constantly that he was spending too much of the agency's money on air tickets. Walton's wife was going through a difficult pregnancy for much of the time he was at ONDCP and he longed to be with her. But his mandate was clear: carry the antidrug gospel to the state and local level. It didn't take long for Walton to realize it wasn't only the number of trips he was taking that annoyed the Bennettistas, but also their destinations. He visited Indian reservations and barrios. He palavered with the People's Coalition in Chicago, a low-income community group that was one of Bennett's biggest critics when he was secretary of education. "These people are Americans and they deserve to be heard," Walton argued. "I'm not just going to visit governors and police chiefs."

A couple of weeks after Iraq invaded Kuwait, Walton told Bennett that a judgeship was opening again on the D.C. criminal court and he wanted to resign to take it. Please don't, Bennett said. Between us: I'm going to quit soon and I'd like you to be in position to be my successor. Walton was angry — he wouldn't have left the bench in the first place had he known Bennett was going to quit so soon — but he agreed to stay on for a shot at the czar's job.

One of the main arguments in favor of letting prosecutors confiscate a drug defendant's potential lawyer fees was that defendants can always rely on public defenders. "Under the Constitution, defendants are entitled to legal advice, not to high-priced advice," one federal prosecutor explained at the time the law was first proposed.

But now even low-priced advice was becoming unavailable. The number of drug cases filed in DeKalb County, Georgia — suburban

*[handwritten:]* D2

# Partisan Justice

**By JOSEPH D. RICH**

WASHINGTON

THE SCANDAL unfolding around the firing of eight US attorneys compels the conclusion that the Bush administration has rewarded loyalty over all else. A destructive pattern of partisan political actions at the Justice Department started long before this incident, however, as those of us who worked in its civil rights division can attest.

I spent more than 35 years in the department enforcing federal civil rights laws — particularly voting rights. Before leaving in 2005, I worked for attorneys general with dramatically different political philosophies — from John Mitchell to Ed Meese to Janet Reno. Regardless of the administration, the political appointees had respect for the experience and judgment of longtime civil servants.

Under the Bush administration, however, all that changed. During the past six years, this Justice Department has ignored the advice of its staff and skewed aspects of law enforcement in ways that clearly were intended to influence the outcome of elections. *Court proceedings, etc.*

It has notably shirked its legal responsibility to protect voting rights. From 2001 to 2006, no voting discrimination cases were brought on behalf of black or native American voters. US attorneys were told instead to give priority to voter fraud cases, which,



JOHN OVERMYER

when coupled with the strong support for voter ID laws, indicated an intent to depress voter turnout in minority and poor communities.

At least two of the recently fired US attorneys, John McKay in Seattle and David Iglesias in New Mexico, were targeted largely because they refused to prosecute voting fraud cases that implicated Democrats or voters likely to vote for Democrats.

This pattern also extended to hiring. In March 2006, Bradley Schlozman was appointed interim US attorney in Kansas City, Mo. Two weeks earlier, the administration was granted the authority to make such indefinite appointments without Senate confirmation. That was too bad: A Senate hearing might have uncovered Mr. Schlozman's central role in politicizing the civil rights division during his three-year tenure.

Schlozman, for instance, was part of the

they group that oversaw the division when the Justice Department approved a Georgia law requiring voters to show photo IDs at the polls. These decisions went against the recommendations of career staff, who asserted that such voter ID laws discriminated against minority voters who were less likely to have such IDs.

Schlozman continued to influence elections as an acting US attorney. Missouri had one of the closest Senate races in the country last November, and a week before the election, Schlozman brought four voter fraud indictments against members of an organization representing poor and minority people. This blatantly contradicted the department's longstanding policy to wait until after an election to bring such indictments because a federal criminal investigation might affect the outcome of the vote. The timing of the Missouri indictments could not have made the administration's aims more transparent.

This administration is also politicizing the career staff of the Justice Department. Outright hostility to career employees who disagreed with the political appointees was evident early on. *going back to 1980's.* Seven career managers were removed in the civil rights division. I personally was ordered to change performance evaluations of several attorneys under my supervision. I was told to include critical comments about those whose recommendations ran counter to the political will of the administration and to improve evaluations of those who were politically favored.

**M**ORALE plummeted, resulting in an alarming exodus of career attorneys. In the past two years, 55 to 60 percent of attorneys in the voting section have transferred to other departments or left the Justice Department entirely.

At the same time, career staff were nearly cut out of the process of hiring lawyers. Control of hiring went to political appointees, so an applicant's fidelity to GOP interests replaced civil rights experience as the most important factor in hiring decisions.

For decades prior to this administration, the Justice Department had successfully kept politics out of its law enforcement decisions. Hopefully, the spotlight on this misconduct will begin the process of restoring dignity and nonpartisanship to federal law enforcement.

As the 2008 elections approach, it is critical to have a Justice Department that approaches its responsibility to all eligible voters without favor.

---

# NEWS

# Long-hidden report details FBI crimes

WASHINGTON — An internal FBI report kept under wraps for three years details dozens of cases of agents fired for egregious misconduct and crimes, including drug trafficking, attempted murder, theft, misuse of informants and consorting with prostitutes.

The report, released Wednesday by Sen. Charles Grassley (R-Iowa), found that about one in 1,000 agents was dismissed for serious misconduct or criminal offenses by the FBI during the period examined, from 1986 to 1999. The average was between eight and nine per year.

Grassley, a senior member of the Senate Judiciary Committee, said in a letter Wednesday to FBI Director Robert Mueller that he was concerned about "a lack of response to the findings and recommendations, a general lack of support for the project and even efforts to prevent its completion."

FBI Assistant Director Cassandra Chandler said: "Director Mueller is committed to undertaking the reforms necessary to strengthen the disciplinary process within the FBI."

Career Employees of the DOJ
Working for the DOJ Attorneys
All Divisions within at least, DOJ
D2

If President Clinton is serious about cutting federal spending, he should hand a sharp ax to his new Attorney General designate and tell her to start swinging it. Justice is Washington's fastest-growing and most duplicative bureaucracy.

# How about a little *MAJOR* restructuring?

By Janet Novack



**The Justice Department has been a prime instrument for thrusting the federal government ever deeper into the lives of the citizenry.**

SINCE 1980 the U.S. Department of Justice's budget has more than quadrupled. In this period, Justice's payroll has swelled from 53,400 to nearly 98,000, growing 4½ times faster than federal civilian payrolls as a whole. Today there are 4,200 local assistant U.S. attorneys, 2½ times as many as in 1980.

As its staffs have grown, so has Justice's role in American society—although the real work Justice does hasn't risen as fast as its staff. This illustrates once again the truth of C. Northcote Parkinson's Law of bureaucracy: Work expands so as to fill the time available for its completion. And Parkinson further observed, as the real or imagined work expands, the bureaucrats ask for more bureaucrats to do it.

The Justice Department has been a prime instrument for thrusting the federal government ever deeper into the lives of the citizenry. When the U.S. government was born there were 3 specific federal crimes: treason, counterfeiting and piracy on the high seas. With patriotism in intellectual disrepute, there isn't much work for Justice in the treason line today. Counterfeiting remains a problem but accounts for only about 2% of U.S. prosecutions. Old-fashioned piracy scarcely exists. But Justice is not running out of work. Congress keeps defining new crimes. Today there are not 3 federal crimes but more than 3,000.

Why has Justice grown so explosively? *bull game*

Because the politicians, frustrated by high taxes and by the deficit, have found a way to grandstand for the voters without increasing visible taxes. Hiring a few thousand new lawyers and sleuths is a lot cheaper than finding tens of

*e.g.,*
*"Warehousing"*



Attorney General designate Janet Reno
Will she carry a sharp enough ax?

D3

# The government forsakes justice to protect its own

*Detroit Free-Press*

Several people who watched and read about the congressional hearing on the siege of the David Koresh compound in Waco, Texas, expressed their surprise about the reported lies and improprieties by the federal agents who participated.

This is nothing new. I have seen this kind of thing taking place for years, not only in official investigations, but in the courts as well. I wrote a column several months ago about how the FBI lies and takes part in cover-ups involving police corruption in Porter County.

I have since learned that the FBI agent who I believe has been involved in cover-up activities involving police corruption reported my article to the U.S. Department of Justice in Washington. How refreshing it is to know that big brother is watching your every move!

I was under the impression that citizens had the right to freely express themselves guaranteed under the First Amendment. Apparently that right is going by the wayside. I had no idea that the FBI and the U.S. Department of Justice were so interested in my public writings. I wonder what they will do when I write a book? I can only hope that the same agents who took part at Waco do not show up at my house. I guess governmental authorities get a little upset when they see that someone is willing to inform the public about what is really going on.

The FBI well knows that I have a great deal of information about their improprieties. I have accompanied a former undercover police officer, who was interested in reporting evidence of police corruption in Porter County, to the U.S. Attorney's Office in Hammond. Unfortunately, the U.S. Attorney's Office would not let him file his report. The former officer even had a tape recording of police officers discussing their intentions of violating certain people's rights in Porter County. It seems funny that the U.S. Attorney's Office would turn away such evidence.

I have seen federal judges in Hammond allow the police to commit perjury in the courtroom so that police will be able to escape responsibility for their wrongful and unlawful actions. I have seen a judge disallow a tape recording that would prove that the police lied at trial.

Unfortunately for the public, this is now the system works, and it is no accident. Government officials know exactly what they are doing and how to get away with things. And they know that when things go wrong and start looking bad, there will always be another government official higher up on the ladder who will take care of things.

No, I do not need to watch the Waco hearings to learn about corruption in our government. I can see plenty of it right here. It's just too bad that government officials aren't willing to abide by the same standards it expects from its citizens.

While I share the feeling of many people around the country that we will be much better off without David Koresh, I do not believe that the government is standing on high moral ground by its actions of needlessly killing many young children, who were just helpless pawns, at Waco.

After all, we have a government with the highest technological capabilities, a government that is able to send commando troops to rescue hostages all around the world in the most dangerous and hostile environments. It did not have to resort to what it did at Waco.

While federal law makes it clear that our government is forbidden to use federal troops against its own citizens, our government officials have once again walked over the line and thumbed its nose at the laws it swore to uphold. Perhaps these over-hungry zealots feel that they did a macho thing by killing children.

Who will be next? One thing I believe is certain — and I hope that I am wrong — is that not a single government official from the Waco incident who has been proven to have lied or broken any rules or laws will face indictment or lose his job as the ordinary person would. Why? The answer is very simple. History shows that there is a much different standard for government officials, and society puts up with it.

Why does society put up with it even though it doesn't like it? The answer is again very simple. Government protects its own at all costs. While we saw certain politicians trying to make themselves look good during the Waco hearings, I do not believe that there will be a single indictment against a single government official even though the hearings showed evidence of lying and official wrongdoing by several government officials.

What we are really seeing is the game of politics being played at its very best (or worst).

# The Case for Another Drug (Real) War, Against Pharmaceutical Marketers' Dirty Tactic

**JANET MASLIN**

**BOOKS OF THE TIMES**

By the time Melody Petersen gets around to interviewing Iowa's state nosologist near the end of "Our Daily Meds," the facts that she cites don't even sound that grim. The nosologist's job is to catalog Iowa's deceased according to cause of death. He processes about 27,000 death certificates a year. And by his reckoning there were only five deaths caused by adverse reactions to prescription drugs in 2002. That low figure is jarringly out of whack with Ms. Petersen's investigation reporting in an angrily illuminating book on drug-related corporate malfeasance and patient peril.

"Could drugs be killing people but escaping all blame, leaving them to harm even more Americans until someone, finally, catches on?" Ms. Petersen asks. Given the information that her book uncovers, this a purely rhetorical question. Her study cites reckless and questionable behavior in all aspects of drug companies' research and marketing ploys, even if much of this is familiar territory. It has been explored by earlier crusaders (notably Marcia Angell in "The Truth About the Drug Companies" and in Ms. Petersen's own journalism. She spent four years as a reporter covering the drug industry for The New York Times.

The newer and scarier material in "Our Daily Meds" concerns the increasingly serious consequences of Americans' dependency on prescription drugs. Disagreeing with Iowa's nosologist, Ms. Petersen says the lethal consequences of overprescribed or misprescribed drugs are too readily accepted as "natural" death. She cites the unwillingness of pathologists to question the wisdom with which doctors dispense medications. The reluctance of hospitals to perform autopsies, she says, has impeded medical research into what these interactions can do.

"Our Daily Meds" begins by illustrating the established drug-company practices that have led to this sorry juncture. There is the rigging of studies, so that to be deemed "effective" a drug need only perform better than a sugar pill. There are the promotional strategies that evade the need for F.D.A. warnings by, say, planting logos for the sexual enhancement drug Viagra and the antidepressant Wellbutrin on Nascar vehicles. There is the co-option of doctors and university researchers by aggressive, payola-dispensing drug company representatives.

Ms. Petersen, who has done much of her digging with the help of obscure but gratifying corporate documents, even finds feedback from doctors about the bribe-style amenities offered by drug company junkets. ("Hotel and cool inside," one said, in an evaluation of a June 1998 drug company program, adding, "Resort places preferred." From a different doctor, miffed at the lack of a chauffeur at another event: "Hired car would have been much preferable."

But she moves to weightier matters in assessing the directions in which heavy drug dependence is leading Americans. First of all there are the business



MOLLY HAWNEY

## Our Daily Meds

How the Pharmaceutical Companies Transformed Themselves Into Slick Marketing Machines and Hooked the Nation on Prescription Drugs

By Melody Petersen

432 pages. Sarah Crichton Books/ Farrar Straus & Giroux. $26.

strategies that have created illnesses out of what used to be facts of life, labeled them as syndromes, and have hooked customers into long-term use of medication to cure them. (Detrol, the obnoxiously advertised cure for what its manufacturer calls "overactive bladder," is a case in point, especially since it can cause hallucinations that resemble symptoms of Alzheimer's disease.) Second, there are the economics of creating chronic consumers for marginally necessary drugs.

Irate as she is that in a period (1990-2003) when Americans doubled what they spent on cars they increased their spending on prescription drugs by 17 times, Ms. Petersen steps back to consider the long-term consequences of this shift in consumption. She notes that the first generation of children raised in front of ubiquitous, sunny drug-company advertisements (which became legal in 1997) has acquired the notions that prescription pills fix everything, and that they are less dangerous than street drugs. Then, looking to the elderly, she points out that increasing numbers of drugs are accumulating in these patients, with little regard for the consequences.

"As older patients move through time, often from physician to physician," one doctor tells her, "they are at increasing risk of accumulating layer upon layer of drug therapy, as a reef accumulates layer upon layer of coral." And when the side effects of sleeping pills or antidepressants mean more elderly people fall down, the solution is not likely to be the scaling back of such prescriptions. "Instead," she writes, "the companies have used a new blockbuster pharmaceutical market for drugs they claim will reduce the chances of breaking a bone." The market for just two of these drugs, Fosamax and Acto-

### Nascar Viagra ads, rigged studies and doctors' junkets.

nel, is expected to be worth $10 billion by 2011.

Ms. Petersen compiles this data in anecdotal style, even though they would have hit harder in more crystallized, succinct form. But although she rambles and repeats herself at times, this material remains tough, cogent and disturbing enough to have a serious impact. So do her recommendations at the end of this chilling investigation.

Among them: Look at the pens and tissue boxes in your doctor's office. If they feature drug ads, then a drug company representative has been courting your doctor, trying to influence the ways in which that doctor issues prescriptions. Don't trust paid celebrity drug endorsements. Be aware that your symptoms may be caused not by illness but by medication, especially when more than one medication is involved. Ms. Petersen urges more study of these interactions, particularly on the part of police officers who can assess drunk drivers but not overmedicated ones.

"Our Daily Meds" also advocates more supervision of doctors' research articles, many of which are ghostwritten by drug company spokesmen. It calls for drug watchdog agencies that are not overseen by the government, since government officials can easily be lobbied. Most drastically, she advocates prison time for executives implicated in pharmaceutical crimes. But those criminals are part of a time-honored tradition. As a federal investigator put it in 1937, after a barely tested elixir killed as many as 30 percent of the people who took it: "Apparently they just throw drugs together and if they don't explode they are placed on sale



"Dr. House wouldn't last a night in Dr. Jauhar's world."

intern

"Takes readers to the heart of every young physician's hardest test: to become a doctor yet remain a human being" —Richard Lacayo, Time

"A gripping tale . . . A great read." —Dr. Melvin Konner, author of Becoming a Doctor

www.fsgbooks.com



## Duke lacrosse players sue school, city

A federal lawsuit filed by 38 current and former Duke University lacrosse players claims they suffered emotional distress during the discredited rape case against three of their teammates. The lawsuit, filed in Durham, N.C., accuses Duke, the city and several school and police officials of fraud, abuse and breach of duty for supporting the prosecution of the case.

Lead attorney Chuck Cooper said the school turned its back on the players to protect its image. Pamela Bernard, Duke's general counsel, said any complaints should be aimed at former prosecutor Mike Nifong, who was disbarred for his handling of the case.

*"I believe there are more instances of the abridgement of freedom of people by gradual and silent encroachments by those in power than by violent and sudden usurpations." — James Madison*

## Commentary

# Righting the wrongs in our criminal justice system

### By Lawrence C. Marshall

There has been increasing recognition in many circles that something is terribly wrong with the way criminal justice is administered in Illinois.

Last Monday, that message was driven home all the way up to the U.S. Supreme Court in the case of Bracy vs. Gramley, in a unanimous decision penned by Chief Justice Rehnquist, the court granted death-row inmate William Bracy the right to depose witnesses and obtain documents in his effort to prove that his murder trial before now-convicted Judge Thomas Maloney was a sham.

At another level, though, the court's decision last Monday was painfully small. For all of us, the decision should cause us to ask ourselves and our political leaders what we are doing to deal with the fact that many of the defendants who sit on the "condemned units" in the Pontiac and Menard Correctional Facilities, and in other prisons throughout the state, have themselves been the victims of grievous wrongs that have been masqueraded as judges and law enforcement authorities.

We have long known about the criminal antics of Thomas Maloney, the judge who presided over the murder trials of six men who now sit on death row. In away he chose, and was convicted. of taking bribes to fix murder cases. And it takes no Ph.D. in economics to understand that if a judge is in the business of selling acquittals, it will not be giving them away for nothing. To cover this, he convicts. As Richard Posner, chief judge of the United States Court of Appeals for the 7th Circuit has written, "any judge who is on the take will have an incentive to... do his best (or worst) to see to it that a defendant who does not bribe him is convicted." Complaints by Bracy and various other state courts have denied Maloney's victims any right to discovery, much less relief. They have reasoned that

affording new trials to defendants who have been tried by corrupt judges would require the reopening of so many murder cases that it would cause too much havoc in our criminal justice system.

Indeed, all of the case, over which Maloney presided during his reign of corruption in the criminal courthouse, only one trial has been reversed on the basis of Maloney's criminal antics.

A Cook County Circuit Court judge has reversed the convictions of the defendants in the trial of El Rukn leaders Hawkins and Fields, in a case in which the evidence that Maloney's corruption impacted the trial was undeniable. Maloney had actually accepted a bribe from these defendants' lawyer as part of a deal to acquit the defendants, but Maloney then returned the bribe and convicted the defendants when he realized that he was under federal investigation.

Even in this case, though, Atty. Gen. Jim Ryan is asking the Illinois Supreme Court to reinstate the convictions and ignore the obvious impact of Maloney's corruption. Because they were involved in bribing a judge, Ryan argues, Hawkins and Fields should not be allowed to complain that their scheme backfired.

This response may seem to have some appeal at first glance, until it is recognized that the attorney general is, in essence, arguing that these men's penalty for bribing a judge should be death.

The circumstances in the courts and the attorney general have taken to our death cases involving Maloney displays callous indifference to any conception of a fair and just judicial system. How can we—"the people of the State of Illinois"—in whose name Thomas Maloney condemned and convicted defendants, sit idly and watch as it all unfolds? If only the circumstances were such that it would be too burdensome to try and correct the consequences of this man's criminal actions?

How can we—"the people of the State of Illinois"— in whose name Thomas Maloney condemned and convicted defendants, sit idly and claim that it would be too burdensome to try and correct the consequences of this man's criminal actions?

**138 L.Ed. 2d 97 (1997)**

Maloney was our agent and we have a legal and moral duty to actively repair the damage he committed in our name.

As I suggested at the outset, the 7th Circuit, whose decision from the appeals court's ruling in the Bracy case was vindicated by last Monday's Supreme Court decision, was entirely correct when she wrote that "we may no more trust Maloney as an impartial arbiter for constitutional purposes than a defendant whom the IRS asks audits the one who placed the black robe and hoodwinks everyone with a credible impersonation of Oliver Wendell Holmes."

Yet, knowing this, what has our governor, our attorney general or our state's attorney done to determine the impact and repair the damage of Maloney's criminal actions?

Worse yet, these same "leaders" done in reaction to the Chicago Police Department's own finding that some of its officers, most particularly Cmdr. John Burge, tortured scores of prisoners—many of whom are now on death row—in the office in the police's own actions. Standards—surely no leftist view that the law condemns police practice—has determined that Burge and his men engaged in a prolonged pattern of torture that included, in many cases, the use of electric shock devices, Russian Roulette, suffocation and beatings. Burge has since been fired and a federal court has awarded damages to at least one of his victims. But as of today, no systematic action has been taken to examine the circumstances of the many confessions Burge extracted and to determine in which cases the government should be actively seeking relief on behalf of Burge's victims. Rather, the attorney general has resisted every effort to seek relief for Burge's victims, claiming in some judicial forum that when the trials, he sit with mountains of

procedural arguments designed to stop him from ever having his claims heard in any judicial forum.

Leaving matters such as the pleadings of Burge's detainees in the courts has proven to be insurmountable. The barriers that they face are insurmountable. The procedural barriers that face inmates raising new claims years after their convictions have become final; most inmates whose convictions have become final have no attorneys and no resources.

Rather, if we are a community that is truly concerned about justice, we must take some proactive measures to address the impact of Maloney's and Burge's actions. We created these problems and real harm; only their victims whole.

An independent commission, comprised of people from all walks of life who will inspire public trust, should be created to study each of the cases involving Maloney, Burge and others who have been found to have engaged in these sorts of conduct.

This commission should be charged with the task of making recommendations to the state's attorney and governor as to whether new trials, pardons, or no action at all are in order. In the meantime, we ask them that we can all feel more secure that we have taken some real action to fulfill our responsibility of remedying the wrongs that have been committed in our names by our agents.

The decision in Bracy vs. Gramley should cause all to remember that the system that stated, elected, retained and tolerated Thomas J. Maloney (and the six killing judges who were convicted with him), is all of us. We—citizens, leaders of the judiciary and the bar—must now make amends. Let us show that we are concerned about all sorts of crime victims—even when the perpetrators used to wear robes and badges.

*Lawrence C. Marshall is a professor of law at Northwestern University School of Law and works with the school's Legal Clinic, where he has represented a number of defendants. He was one of the attorneys for William Bracy. He was one of the attorneys on an amicus curiae brief filed in the U.S. Supreme Court in support of William Bracy.*

**3575 E. CHICAGO AVE.**

**CHICAGO, ILL. 60611**

**(312)905-8962**

*Goldberg v. Kelly, 397 US 254, 269 (1970).*

*"The opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard."*

EXHIBIT

**P6**

# Accomplices To Perjury

### By Alan M. Dershowitz

CAMBRIDGE, Mass. — As I read about the disbelief expressed by some prosecutors at the Mollen Commission's recent assertion that police perjury is "widespread" in New York City, I thought of Claude Rains's classic response, in "Casablanca," on being told there was gambling in Rick's place: "I'm shocked — shocked!"

For anyone who has practiced criminal law in the state or Federal courts, the disclosures about rampant police perjury cannot possibly come as a surprise. "Testilying" — as the police call it — has long been an open secret among prosecutors, defense lawyers and judges.

Irving Younger, a onetime New York City Criminal Court judge, described police testimony in search and seizure cases this way: "When one ... looks at a series of cases, [it] then becomes apparent that policemen are committing perjury at least in some of them, and perhaps in nearly all of them."

Judge Younger concluded that the solution to this pervasive problem was "prosecutors' work," since the "courts can only deplore" while the prosecutors can refuse to put perjuring policemen on the witness stand and can prosecute them if they lie.

He was correct in identifying the problem and in arguing that prosecutors bore considerable responsibility for its persistence. But he let the courts off the hook too easily: the central villains in the perjury scandal are precisely judges who, for decades, have pretended to believe the tallest tales told by lying cops in the face of overwhelming evidence of pervasive perjury.

Without the complicity of judges, police perjury would be reduced considerably. Officers know that in many

the most blatant perjury without judicial rebuke or prosecution.

I have seen trial judges pretend to believe officers whose testimony is contradicted by common sense, documentary evidence and even unambiguous tape recordings. And I have seen appellate judges close their eyes to such patently false findings of fact. Judicial acceptance of obviously false testimony sends a subtle yet powerful message of approval, if not encouragement, to perjurers.

In Boston, the police routinely made up imaginary informers to justify searches and seizures, and the judges believed them.

In a Federal case in New York, a judge credited the testimony of a policeman even though he was caught on

## Judges know when officers lie. They share the blame.

tape telling an informer that if he testified truthfully, he would run him over "with a truck" and that if the informer ever said "that I said it, I'm gonna deny it." The cop then denied saying it, and despite the tape the judge pretended to believe him.

In Nassau County, a policeman showed a key witness photographs of a suspect before the witness was asked to pick the suspect out of a lineup, and then denied under oath that he had done so.

Many trial judges were prosecutors, and they know perjury when they hear it — and they hear it often enough to be able to do something about it. Yet many tolerate it because they think most victims of police perjury are guilty of the crimes for which they stand charged.

Some judges refuse to close their eyes to perjury, but they are the rare exception to the rule of blindness, deafness and muteness that guides the vast majority of judges and prosecutors.

The Mollen Commission includes a former judge and prosecutor; unless it broadens its focus to include judges and prosecutors who subtly encourage perjury, nothing will change.

A few cops will be prosecuted, and a quarter-century from now yet another blue-ribbon commission will be "shocked — shocked" at the pervasiveness of police perjury in the criminal justice system.

*Alan M. Dershowitz is professor of law at Harvard.*

"For those who choose, and for my part I think it less evil that alleged criminals should escape than the government play an ignoble role. For those who agree with me, no distinction should be taken between the government as prosecutor and the government as judge." Olmstead v. US, 277 US 438, 470 (1928)

E1

# Legal News

VOL. 15 No. 8
ISSN 1075-7678

*Dedicated to Protecting Human Rights*

August 2004

## The Complicity of Judges In Wrongful Convictions

### by Hans Sherrer

### I. Introduction

**W**rongful convictions do not occur in a vacuum of judicial indifference. Every wrongful conviction results from a deliberative process involving law enforcement investigators, prosecutors, and one or more trial level and appellate judges. Although prosecutors, police investigators, defense lawyers and lab technicians have all been lambasted in books and magazines for their contribution to wrongful convictions, judges have, by and large, been given a free pass. This hands-off attitude may be due to the fact that sitting in their elevated positions, judges are often thought of by lay people and portrayed by the news and other broadcast media, as impartial, apolitical men and women who possess great intelligence, wisdom, and compassion, and are concerned with ensuring that justice prevails in every case. Reality, however, is far different from that idealistic vision.

In *Courts on Trial: Myth and Reality in American Justice*, one of the few serious critiques of this country's judiciary by an insider, Federal Judge Jerome Frank wrote, "Our courts are an immensely important part of our government. In a democracy, no portion of government should be a mystery. But what may be called "court-house government" still is mysterious to most of the laity." Judge Frank's book was in stark contrast to what he referred to as "the traditional hush-policy concerning the courts." That unspoken policy continues to obscure the inner workings of the courts.

Peering beneath the public facade that has long protected judges from serious scrutiny, reveals that from their lofty perch they are the most crucial actor in the real-life drama of an innocent person's prosecution and conviction.

### II. Judges Are Political Creatures

Contrary to their carefully cultivated public image of being independent and above the frays of everyday life, judges are influenced and even controlled by powerful and largely hidden political, financial, personal and ideological considerations. Renowned lawyer Gerry Spence clearly recognized in *From Freedom To Slavery* that judges are, first and foremost, servants of the political process:

"We are told that our judges, charged with constitutional obligations, insure equal justice for all. That, too, is a myth. The function of the law is not to provide justice or to preserve freedom. The function of the law is to keep those who hold power, in power. Judges, as Francis Bacon remarked, are "the lions under the throne".... Our judges, with glaring exceptions loyally serve the ... money and influence responsible for their office."

Despite never ending proclamations of their independence, members of the judiciary, all the way from a local judge in Small Town, USA to a U.S. Supreme Court justice, are inherently involved in political activities and are subject to a multitude of political and other pressures. The political nature of judges that affects their conduct and rulings is an extension of the fact that there is not a single judge in the United States, whether nominated or elected, whether state or federal, that is not a product of the political process as surely as every other political official whether a city mayor, a county commissioner, a state representative, a member of Congress or the President.

Vincent Bugliosi, the former Los Angeles deputy D.A. most well known for prosecuting Charles Manson, clearly understands that every judge in this country is only a thinly veiled politician in a black robe. He wrote in *The Betrayal of America* (2001):

"The American people have an understandably negative view of politicians, public opinion polls show, and an equally negative view of lawyers. Conventional logic would seem to dictate that since a judge is normally both a politician and a lawyer, people would have an opinion of them lower than a grasshopper's belly. But on the contrary, the mere investiture of a twenty-five-dollar black cotton robe elevates the denigrated lawyer-politician to a position of considerable honor and respect in our society, as if the garment itself miraculously imbues the person with qualities not previously possessed. As an ex-

### Inside

| | |
|---|---|
| Exporting American Crime | 10 |
| From the Editor | 12 |
| Habeas Hints | 14 |
| Montana Strip Cells | 16 |
| Prisoners of the Census | 19 |
| New Jersey Civil Commitment | 21 |
| Rape of Women Prisoners | 22 |
| California Guards Sue Prisoners | 24 |
| Executions in 2002 | 24 |
| Book Restriction Enjoined | 30 |
| Washington Parole Revocations | 32 |
| Tennessee Medical Problems | 37 |
| News in Brief | 42 |

E2



E3

FINANCIAL TIMES WEDNESDAY MAY 7 2008

*Financial Times*   **5**

## World News

5/6/08  F.T.

# Report warns of threats to freedom in US

### 'Grave concern' over renditions

**By Daniel Dombey**
**in Washington**

The US "war on terror" has restricted the freedom of individual Americans – but to a lesser degree than in previous conflicts, a study said yesterday.

Freedom House, a US group best known for its work overseas, expresses "grave concern" at measures such as extraordinary rendition, "mistreatment of those in US custody" and warrantless wiretaps.

But it says: "The war on terrorism has resulted in significantly fewer violations of individual freedom than previous conflicts."

The other incidents it cites include the mass detention of Japanese-Americans during the second world war, and Federal Bureau of Investigation and Central Intelligence Agency investigations of thousands of US citizens opposed to the Vietnam war.

Freedom House describes itself as an independent non-governmental organisation but it is largely financed by US federal funds.

Its report, "Today's American – How Free?", distinguishes between the impact of steps such as the rendition of third country nationals, which it says have hurt the reputation of the US internationally, and measures that could directly affect US citizens.

"While there is as yet little evidence to suggest that counter-terrorism programmes have severely impinged on the rights of substantial numbers of Americans, the potential for more widespread violations must be taken seriously," it says. "The prospects are good for further action by the courts and Congress to curtail or terminate initiatives that pose threats to individual rights."

The report calls its findings on the functioning of the US criminal justice system "perhaps the most disquieting in this study".

It highlights the rise in incarceration rates from 1.39 per thousand in 1980 to 7.5 in 2006, the high proportion of black inmates and complaints that public defence lawyers are underfunded and overworked.

The US administration vigorously rejects any suggestion that its policies have hurt individual liberties. "The US has some of the highest standards in the world when it comes to maintaining the civil rights and liberties of our citizens," said Gordon Johndroe, a White House spokesman.

"Our laws are routinely reviewed by the Congress and the courts and, where changes have been required, changes have been made."

# McCain seeks to allay fears on the right

### Pledge to nominate conservative judges

### Resentment over role in 'Gang of 14'

**By Andrew Ward**
**in Washington**

John McCain promised yesterday to nominate conservative judges to the Supreme Court and for other judicial vacancies, seeking to quash doubts among some Republicans about his conservative credentials.

The Republican presidential candidate said he would use John Roberts and Samuel Alito, who were appointed to the Supreme Court by President George W. Bush, as his "model" when choosing nominees.

Judicial nominations have become one of the most explosive flash points in the US "culture war" between liberals and conservatives, with each side accusing the other of pushing their agenda through the courts.

Mr McCain is viewed with suspicion by some conservatives because of his willingness to work with Democrats in Congress and his history of conflict with fellow Republicans. But the senator insisted he would stick to conservative principles when appointing judges.

"I have my own standards of judicial ability, experience, philosophy and temperament," he said. "And Chief Justice Roberts and Justice Samuel Alito meet those standards in every respect."

Mr McCain warned that both Barack Obama and Hillary Clinton, the Democratic presidential contenders, favoured judges who would ride roughshod over the constitution. "They are both lawyers and don't seem to mind at all when fundamental questions of social policy are pre-emptively decided by judges instead of by the people and their elected representatives," he said.

Many conservatives believe federal judges have exceeded the powers granted them by the constitution in recent decades with precedent-setting rulings such as the *Roe v Wade* decision that legalised abortion.

Mr McCain criticised Mr Obama for opposing the nomination of Mr Roberts in 2005, arguing that the "partisan" vote undermined the Illinois senator's claim to be a consensus-builder.

Some conservatives resent Mr McCain's membership of the so-called "Gang of 14" senators.

The group brokered a compromise in 2005 after Republicans threatened to change Senate rules to stop Democrats blocking judicial nominations by the Bush administration.

> 'Obama and Clinton don't seem to mind when questions of social policy are decided by judges'

Mr McCain defended his role in the episode yesterday, arguing that the deal helped secure the nomination of Mr Roberts and other conservative judges.

Ed Whelan, president of the Ethics and Public Policy Center, a conservative legal group, said Mr McCain's speech was "very encouraging" and drew "a clear line between his support for judicial restraint and Obama's promise to appoint liberal judicial activists".

"Promising four more years of radical judges who are bent on rolling back our basic rights and freedoms is just one more example of why John McCain is the wrong choice for America's future," said Karen Finney, for the Democratic National Committee.

**Republicans must change to win, Page 11**

F1

**HEADING TOWARD 2008: Money, Promises and Memories**

# Attacking Bush, Clinton Urges Government Overhaul

**By NICHOLAS CONFESSORE**

MANCHESTER, N.H., April 13 — Saying that the last six years had "gotten the truth of many Americans in our government," Senator Hillary Rodham Clinton proposed a series of initiatives on Friday to make the federal government more competent, effective and thrifty.

In a wide-ranging speech, Mrs. Clinton attacked the Bush administration for its handling of Hurricane Katrina, the controversy over the replacement of United States attorneys and fraud involving government contracts in Iraq. Mrs. Clinton characterized the current White House as having "a stunning record of counter-cronyism and corruption, incompetence and ideology."

In the address, her first major policy speech on the campaign trail, she proposed to restrict tech-bid government contracts sharply and make the details of all government contracts available online, along with the budgets of government agencies. Mrs. Clinton also called for extend-

ing the whistle-blower shield laws to government employees, and said she would ban members of her cabinet and other high-ranking administration officials from lobbying her administration after they left.

Most strikingly, Mrs. Clinton proposed eliminating as many as 500,000 private contractors from the federal



*A major policy speech in an important primary state.*



payroll, a move she said would save $10 billion to $18 billion a year.

She criticized the rapid privatization of government services under the Bush administration, saying that some contractors cost more than government workers and made them less accountable and less transparent.

"Just think of what happened at

Walter Reed," she said, referring to recent reports of poor health care and neglect at the Army medical center of the same name in Washington. "When the Army was forced to outsource maintenance to private contractors, the number of people doing maintenance dropped dramatically, the contractor cut corners, fell down on the job, and our soldiers paid the price."

A White House spokesman said that as a matter of policy, the administration did not comment on political attacks from the campaign trail.

Mrs. Clinton spoke before a largely sympathetic audience, a capacity crowd of about 200 students and faculty members at the New Hampshire Institute of Politics at St. Anselm College. Mrs. Clinton is in New Hampshire for two days of campaigning in the nation's first primary state, and was planning two public forums to court local Democrats.

While pledging to reduce government waste, Mrs. Clinton also proposed the creation of two government entities and the re-creation of a

defunct agency, the Office of Technology Assessment. That office was established in the 1970s to advise Congress on new technologies and available government programs, but was abolished by Congressional Republicans in 1995.

Mrs. Clinton said the last six years had freakily demonstrated the relevance of such an agency.

"The administration has tried to turn Washington into an evidence-free zone, whether it's on stem cell research or Plan B contraception or pollution or global warming or the safety of our food, or the quality of our air," she said.

Harking back to efforts by her husband's administration to "reinvent" the federal government, Mrs. Clinton said she would create an agency to track public subsidies to businesses and help identify waste and fraud.

"This isn't about big government, or small government," she said. "This should be about smart government."

Though she did not bash any government-issued arbitrary with



Senator Hillary Rodham Clinton in Manchester, N.H., cited Bush administration of "a stunning record of cronyism and corruption."

hammer — as Vice President Al Gore did in 1993 in a television appearance to illustrate infuriating federal procurement regulations — Mrs. Clinton did take a rhetorical hammer to the Bush administration.

"For the past six years, we've had an administration that doesn't be-

lieve in big government, or government at all — under present appearance," she said. Accusing the Republican Party of leaving the "constant cronyism," she asserted that the administration had used federal agencies and contracts "as a source for private interests."